**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CHEYENNE RIVER SIOUX TRIBE<br>24 E Street<br>Eagle Butte, South Dakota 57625<br>                              Plaintiff,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as<br>PRESIDENT OF THE UNITED STATES<br>1600 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20500<br>                              Defendant,<br><br>MARK R. MEADOWS, in his official capacity<br>as WHITE HOUSE CHIEF OF STAFF<br>1600 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20500<br>                              Defendant,<br><br>DOUGLAS L. HOELSCHER, in his official<br>capacity as DEPUTY ASSISTANT TO THE<br>PRESIDENT, WHITE HOUSE DIRECTOR<br>OF INTERGOVERNMENTAL AFFAIRS<br>1600 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20500<br>                              Defendant,<br><br>DEBORAH L. BIRX, M.D., in her official<br>capacity as WHITE HOUSE CORONAVIRUS<br>RESPONSE COORDINATOR<br>1600 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20500<br>                              Defendant,<br><br>DAVID L. BERNHARDT, in his official<br>capacity as SECRETARY, UNITED STATES<br>DEPARTMENT OF THE INTERIOR<br>1849 C Street, N.W.<br>Washington, D.C. 20240<br>                              Defendant, | Case No.: 1:20-cv-01709<br>_____<br><br>COMPLAINT FOR INJUNCTIVE<br>AND DECLARATORY RELIEF |

TARA KATUK MAC LEAN SWEENEY, in her official capacity as ASSISTANT SECRETARY – INDIAN AFFAIRS, DEPARTMENT OF INTERIOR
1849 C Street N.W.
Washington, D.C. 20240

                           Defendant,


DARRYL LACOUNTE, in his official capacity as DIRECTOR, BUREAU OF INDIAN AFFAIRS, DEPARTMENT OF INTERIOR
1849 C Street, N.W.
Washington, D.C. 20240

                           Defendant,


JAMES D. JAMES, in his official capacity as DEPUTY DIRECTOR, BUREAU OF INDIAN AFFAIRS, DEPARTMENT OF INTERIOR
1849 C Street, N.W.
Washington, D.C. 20240

                           Defendant,


CHARLES ADDINGTON, in his official capacity as DEPUTY DIRECTOR, OFFICE OF JUSTICE SERVICES, DEPARTMENT OF INTERIOR
1849 C Street, N.W.
Washington, D.C. 20240

                           Defendant,


WILLIAM MCCLURE, in his official capacity as SPECIAL AGENT IN CHARGE, DISTRICT I, OFFICE OF JUSTICE SERVICES, DEPARTMENT OF INTERIOR
115 4th Avenue, SE
Aberdeen, SD 57402-0150

                           Defendant,


TIM LAPOINTE, in his official capacity as GREAT PLAINS REGIONAL DIRECTOR, BUREAU OF INDIAN AFFAIRS, DEPARTMENT OF INTERIOR
115 4th Avenue, SE
Aberdeen, SD 57402-0150

                           Defendant.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF – 1:20-cv-01709

Plaintiff Cheyenne River Sioux Tribe is a federally recognized Indian Tribe.  By and through its counsel, Plaintiff Cheyenne River Sioux Tribe states and alleges as follows:

## INTRODUCTION

1.      Plaintiff Cheyenne River Sioux Tribe ("Tribe") files this Complaint for injunctive and declaratory relief against the Defendants  Donald J. Trump, President of the United States; Mark Meadows, White House Chief of Staff; Douglas Hoelscher, White House Director of Intergovernmental Affairs; Dr. Deborah Birx, White House Coronavirus Response Coordinator; David Bernhardt, United States Secretary of the Interior; Tara Katuk Mac Lean Sweeney, Assistant Secretary of the Interior for Indian Affairs; and other Department of Interior officials for threatening to take unlawful actions to shut down the Tribe's Health Safety Checkpoints, including threats of reassumption of control of the Tribe's law enforcement program, in the midst of the unprecedented national COVID-19 public health crisis.

2.      The United States and the nation's Native American tribes are in a state of emergency. COVID-19 is spreading rapidly throughout the country, infecting millions of people, including in South Dakota, which has had 6,353 confirmed cases and 83 deaths outside the boundaries of the Cheyenne River Sioux Reservation.  Experts estimate that, for every confirmed COVID-19 case, there could be as many as eleven unconfirmed cases.  "At this time, there is no known cure, no effective treatment, and no vaccine.  Because people may be infected but asymptomatic, they may unwittingly infect others." *S. Bay United Pentecostal Church v. Newsom*, 590 U.S. ----, 140 S. Ct. 1613, 2020 WL 2813056 at *1 (May 29, 2020) (Roberts, C.J., concurring).

3.      On April 2, 2020, in direct response to the COVID-19 pandemic, the Cheyenne River Sioux Tribe established a comprehensive COVID-19 response plan, including Health Safety Checkpoints to monitor the entry of individuals onto the Tribe's Reservation.  These Health Safety Checkpoints

have allowed the Tribe to effectively track individuals that have returned to the Reservation from hotspots throughout both the state of South Dakota and other off-Reservation locations and to keep the Tribe's rate of infection significantly below the rate for South Dakota at large. To date, the Tribe has had no COVID-19 deaths.

4.     The Tribe's COVID-19 response planning is essential to protect the Tribal population, which suffers heightened vulnerability to the disease because of endemic poverty and health disparities. The Tribe's COVID-19 response planning is especially critical in light of the state's failure to meaningfully protect its residents, including the Tribal population, by enactment of its own comprehensive COVID-19 response. In Chairman Harold Frazier's words, the Tribe has implemented its comprehensive COVID-19 response plan because it has made a choice to be "an island of safety in a sea of uncertainty and death."

5.     Astonishingly, the Tribe's efforts to protects its people with Health Safety Checkpoints became a political flashpoint in the state of South Dakota, inspiring Governor Kristi Noem to issue a series of ultimata to the Tribe. When the Tribe did not capitulate to Governor Noem's demands, she escalated her offensive to the White House, seeking federal government assistance in her quest to shut down the Tribe's Health Safety Checkpoints.

6.     Since Governor Noem's White House plea, all named Defendants have worked in concert, abusing the power of the federal government, to coerce the Tribe to dismantle its comprehensive COVID-19 response plan, including shutting down the Tribe's Health Safety Checkpoints. When that did not work, Defendants pivoted to punishment: threatening the Tribe's Public Law 93-638 law enforcement contract through an unlawful emergency reassumption - imperiling Tribal public safety as well as public health. Such threatened governmental actions represent unlawful

infringement on Tribal self-government and self-determination and put the Tribe's members at risk of imminent harm.

7.      Plaintiff therefore asks that the Court enjoin the Defendants' actions and declare them unlawful.

## PARTIES

8.      Plaintiff CHEYENNE RIVER SIOUX TRIBE ("Cheyenne River Sioux" and "Tribe") is a federally recognized Indian tribal government whose governing body is recognized by the Secretary of the Interior.  *See* 85 Fed. Reg. at 5,463 (Jan. 30, 2020).  The Cheyenne River Sioux Tribe is responsible for the health, safety, and welfare of its members.  The Cheyenne River Sioux Tribe is comprised of four of the seven bands of the Lakota: *Itazipco* (Sans Arc), *Mnicojou* (Planters by the Water), *Oohenumpa* (Two Kettle), and *Siha Sapa* (Blackfoot).  The Cheyenne River Sioux Tribe exercises powers of self-governance and jurisdiction over the Cheyenne River Sioux Reservation, which the Tribe reserved to itself in the Treaty of Fort Laramie with the Sioux, Etc., Sept. 17, 1851, art. 5, 11 Stat. 749 and the Treaty with the Sioux—Brule, Oglala, Mniconjou, Yanktonai, Hunkpapa, Blackfeet, Cuthead, Two Kettle, Sans Arc, and Santee—and Arapahoe, April 29, 1868, 15 Stat. 635 ("1868 Fort Laramie Treaty"), and as set forth in the Act of March 2, 1889, 25 Stat. 888.  The Cheyenne River Sioux Tribe brings this action on its own behalf and on behalf of its members, who include descendants of survivors of the 1890 Wounded Knee Massacre.

9.      The Cheyenne River Sioux Tribe consists of 2,833,157 acres of trust land in an area close to sixty miles long and ninety miles wide.  Of the Tribe's 21,965 members, about 10,000 of them live on the Reservation in twenty-two scattered communities.

10.     In its Constitution and By-Laws, the Cheyenne River Sioux Tribe has set forth the various rights, privileges, and immunities of the Cheyenne River Sioux Tribal government.    The

5

Constitution and By-laws, which have been duly approved by the Secretary of Interior, establish the present-day Tribal governing body, which includes the elected Tribal Chairman, Tribal Secretary, Tribal Treasurer, and fifteen Tribal Councilmen.  The current Chairman of Cheyenne River, Harold C. Frazier, has held the office since 2014.

11.     Defendant DONALD J. TRUMP is the President of the United States and is sued in his official capacity.  The President of the United States is a constitutional officer who is vested with the supreme executive power of the United States.  President Trump is vested with the power to declare a public health emergency.  President Trump declared a public health emergency under the Public Health Service Act on January 31, 2020, issued two national emergency declarations under both the Stafford Act and the National Emergencies Act on March 13, 2020, and invoked emergency powers via Executive Order under the Defense Production Act on March 18, 2020.

12.     Defendant MARK R. MEADOWS is the White House Chief of Staff.  He is sued in his official capacity.

13.     Defendant DOUGLAS L. HOELSCHER is the Deputy Assistant to the President and the White House Director of Intergovernmental Affairs.  He is sued in his official capacity.

14.     Defendant DEBORAH L. BIRX, M.D., is the White House Coronavirus Response Coordinator and Coordinator of the United States Government Activities to Combat HIV/AIDS and United States Special Representative for Global Health Diplomacy, United States Department of State.  She is sued in her official capacity as White House Coronavirus Response Coordinator.

15.     Defendant DAVID L. BERNHARDT is the Secretary of the Interior for the United States Department of Interior.   As the Secretary of Interior, Defendant Bernhardt "upholds trust

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF – 1:20-cv-01709

responsibilities to the 574 federally recognized American Indian tribes and Alaska Natives."[1]  He is sued in his official capacity.

16.     Defendant TARA KATUK MAC LEAN SWEENEY is the Assistant Secretary - Indian Affairs of the United States Department of the Interior ("Assistant Secretary").  As Assistant Secretary, Defendant Sweeney "is responsible for carrying out the Department of the Interior's trust responsibilities regarding the management of tribal trust lands and assets and promoting the self-determination and economic self-sufficiency of the nation's 573 [sic] federally recognized American Indian and Alaska Native tribes and their approximately two million enrolled members."[2]  The Assistant Secretary's decision to demand the shut-down of the Tribe's Health Safety Checkpoints and to threaten the emergency reassumption of the Tribe's Public Law 93-638 law enforcement contract was arbitrary and capricious and an abuse of discretion because it violates the Tribe's civil regulatory jurisdiction, is *ultra vires*, violates the United States' express trust responsibility to the Tribe, and outrageously threatens government retaliation in an effort to curtail the Tribe's jurisdiction and impede the Tribe's right to self-governance.  She is sued in her official capacity.

17.     Defendant DARRYL LACOUNTE is the Director of the Bureau of Indian Affairs, United States Department of Interior and is charged with carrying out the United States' trust responsibility.  He is sued in his official capacity.

---

[1] U.S. Department of Interior, *Who We Are*, https://www.doi.gov/whoweare/secretary-bernhardt (last visited June 16, 2020).
[2] U.S. Department of Interior – Indian Affairs, *Profile - Assistant Secretary - Indian Affairs Tara Katuk Mac Lean Sweeney*, https://www.bia.gov/profile/Assistant-Secretary-Indian-Affairs-Tara-Katuk-Mac-Lean-Sweeney (last visited June 16, 2020).

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF – 1:20-cv-01709

18.     Defendant JAMES D. JAMES is the Deputy Bureau Director, Bureau of Indian Affairs, United States Department of Interior and is charged with carrying out the United States' trust responsibility.  He is sued in his official capacity.

19.     Defendant CHARLES ADDINGTON is the Deputy Bureau Director, Office of Justice Services, Bureau of Indian Affairs, United States Department of Interior and is charged with carrying out the United States' trust responsibility.  He is sued in his official capacity.

20.     Defendant WILLIAM MCCLURE is Special Agent in Charge for District I, Office of Justice Services, Bureau of Indian Affairs, United States Department of Interior and is charged with carrying out the United States' trust responsibility.  He is sued in his official capacity.

21.     Defendant TIM LAPOINTE is Great Plains Regional Director, Bureau of Indian Affairs, United States Department of Interior and is charged with carrying out the United States' trust responsibility.  He is sued in his official capacity.

**JURISDICTION AND VENUE**

22.     This action arises under the Indian Self-Determination and Education Assistance Act, 25 U.S.C. §§ 5301 *et seq*., the United States government's treaty, statutory, and common law trust duty to Native American tribes, and 42 U.S.C. § 801(c)(7), (d).  This action is brought under 25 U.S.C. § 5331 and 5 U.S.C. §§ 702 and 706 to seek injunctive and declaratory relief for violations of federal law.  This Court therefore has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1362.

23.     This Court has personal jurisdiction over Defendants, who are sued in their official capacities.  The violations complained of concern their conduct in such capacities.

24.     Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF – 1:20-cv-01709

25.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(e) because Defendants are

officers of the United States, a substantial part of the actions or omissions giving rise to the claims

occurred in this District, and the Defendants maintain their principal places of business in this

District.

## STATEMENT OF FACTS

### I.    Transmission of COVID-19 and Public Health Guidelines

26.    The United States and the world are in the midst of a public health emergency due to the

exponential spread of COVID-19, the respiratory disease caused by the novel coronavirus SARS-

CoV-2.  According to the Centers for Disease Control ("CDC"), this coronavirus is spreading very

easily and sustainably between people, including by asymptomatic people.[3]  Persons in all age

groups have contracted the disease.[4]

27.    Since April 2020, the United States has led the world in the total number of COVID-19

cases.  As of April 30, 2020, the United States had confirmed over one million cases of COVID-

19 and reported 60,999 deaths due to COVID-19.  In the past month and a half, these numbers

have approximately doubled.  The United States has now confirmed 2,312,302 cases of COVID-

19 and reported 120,402 deaths due to COVID-19 and counting.[5]

---

[3]Ctrs. for Disease Control & Prevention, *How Coronavirus Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited June 21, 2020).

[4] Robert Verity, et al., Estimates of the Severity of Coronavirus Disease 2019: A Model-Based Analysis, The Lancet 6 Infec. Dis. (Mar. 30, 2020), https://www.thelancet.com/action/showPdf?pii=S1473-3099%2820%2930243-76.

[5] Lisa Lockerd Maragakis, *Coronavirus Disease 2019 vs. the Flu,* Johns Hopkins Univ. Health, https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/coronavirus-disease-2019-vs-the-flu (last visited June 23, 2020); *see also* COVID-19 Dashboard, Johns Hopkins Ctr. for Sys. Sci. & Eng'g, https://www.arcgis.com/apps/opsdashboard/index.html#/bda7594740fd40299423467b48e9ecf6 (last visited June 23, 2020) (GIS map of global COVID-19 cases developed by the Johns Hopkins Ctr. for Sys. Sci. & Engineering).

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF – 1:20-cv-01709

28.     Even mild cases of COVID-19 generally involve about two weeks of fevers and dry coughs and are more severe than the flu.[6]

29.     COVID-19 can severely damage lung tissue, cause a permanent loss of respiratory capacity, and also damage kidney, heart, and liver tissues as well as other systemic damage.[7]  The surge of COVID-19 cases also causes mounting strains on healthcare systems, including critical shortages of doctors, nurses, hospital beds, medical equipment, diagnostic tests, and personal protective equipment.[8]

30.     In serious cases, individuals' lungs "become filled with inflammatory material [and] are unable to get enough oxygen to the bloodstream."[9]  Severe cases of COVID-19 cause acute respiratory distress syndrome in which fluid displaces air in the lungs.  Such patients "are essentially drowning in their own blood and fluids because their lungs are so full."[10]  The virus frequently causes extreme symptoms, including fever and chills that can last for weeks,

---

[6] Holly Secon & Aria Bendix, *There is a wide misconception of what a 'mild' case of COVID-19 looks like. It can be ugly and brutal.*, Business Insider (Apr. 16, 2020), https://www.businessinsider.com/mild-coronavirus-cases-high-fever-dry-cough-2020-3.

[7] Ctrs. for Disease Control & Prevention, *Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19)*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html (last visited June 21, 2020).

[8] Megan L. Ranney et al., *Critical Supply Shortages — The Need for Ventilators and Personal Protective Equipment during the Covid-19 Pandemic*, New Eng. J. Medicine, Apr. 30, 2020, https://www.nejm.org/doi/full/10.1056/NEJMp2006141; World Health Org., *Shortage of personal protective equipment endangering health workers worldwide* (Mar. 3, 2020), https://www.who.int/news-room/detail/03-03-2020-shortage-of-personal-protective-equipment-endangering-health-workers-worldwide.

[9] Graham Readfearn, *What happens to people's lungs when they get coronavirus?*, The Guardian (Apr. 14, 2020), https://www.theguardian.com/world/2020/apr/15/what-happens-to-your-lungs-with-coronavirus-covid-19.

[10] Lizzie Presser, *A Medical Worker Describes Terrifying Lung Failure From COVID-19 — Even in His Young Patients*, ProPublica (Mar. 21, 2020), https://www.propublica.org/article/a-medical-worker-describes--terrifying-lung-failure-from-covid19-even-in-his-patients.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF – 1:20-cv-01709

excruciating pain, debilitating fatigue, an unremitting cough, uncontrollable diarrhea, and an inability to keep down food and water.[11]

31.     People of all ages have contracted COVID-19 and died from it, but the illness poses special risks for the elderly and those with certain preexisting medical conditions.  According to the CDC's analysis, 80% of all COVID-19 related deaths in the United States are people aged 65 and older.[12] COVID-19 also poses greater risks for people with preexisting heart and respiratory conditions, individuals with compromised immune systems, and those with many other conditions.[13]  As of May 30, 2020, among COVID-19 cases, the most common underlying health conditions were cardiovascular disease (32%), diabetes (30%), and chronic lung disease (18%).[14]  Hospitalizations were six times higher and deaths 12 times higher among those with reported underlying conditions compared with those with none reported.[15]

32.     The effects of the pandemic on public social interaction will last well into the summer of 2020, if not far longer. Experts have indicated that seasonal changes are "unlikely to stop transmission."[16]  Dr. Anthony Fauci, head of the National Institute of Allergy and Infectious

---

[11] *See, e.g.*, *id.*; Leah Groth, *Is Diarrhea a Symptom of COVID-19? New Study Says Digestive Issues May Be Common with Coronavirus*, Health (Mar. 20, 2020), https://www.health.com/condition/infectious-diseases/coronavirus/is-diarrhea-a-symptom-of-covid-19.

[12] Ctrs. for Disease Control & Prevention, *Older Adults*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last visited June 23, 2020)

[13] Ctrs. for Disease Control & Prevention, *Groups at Higher Risk of Severe Illness*,https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited June 23, 2020).

[14] Ctrs. for Disease Control & Prevention, *Morbidity & Mortality Weekly Report*, June 19, 2020, https://www.cdc.gov/mmwr/volumes/69/wr/mm6924e2.htm

[15] *Id.*

[16] Marc Lipsitch, Harvard T.H. Chan School of Public Health, Ctr. for Communicable Disease Dynamics, *Seasonality of SARS-CoV-2: Will COVID-19 go away on its own in warmer weather?* https://ccdd.hsph.harvard.edu/will-covid-19-go-away-on-its-own-in-warmer-weather/ (last visited June 21, 2020).

11

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF – 1:20-cv-01709

Diseases, recently reiterated his warning of a second wave of COVID-19 infections in the United States and that while he "would hope to get to some degree of real normality within a year or so," he doesn't "think it's this winter or fall."[17]  Indeed, Dr. Fauci recently clarified that "when people talk about a second wave in the summer, you can't talk about a second wave in the summer because we're still in the first wave."[18]

## II.   COVID-19 in South Dakota

33.    The COVID-19 pandemic has deeply affected South Dakota.  As of June 23, 2020, the State had confirmed 6,353 cases.[19]  Eighty-three South Dakotans have died from the disease.[20]

34.    There has never been a statewide stay-at-home order in South Dakota, nor are there any active local stay-at-home orders that apply to all citizens in non-Tribal areas.  The State's decision to forego a statewide order has been the source of considerable controversy, as was the Governor Kristi Noem's decision to use state resources to participate in trials of hydroxychloroquine to treat COVID-19.[21]

---

[17] Ros Krasny, *Don't Plan on Summer Holidays in U.S., Fauci Tells the British*, Bloomberg (June 14, 2020), https://www.bloomberg.com/news/articles/2020-06-14/don-t-plan-on-summer-holidays-in-u-s-fauci-tells-the-british.

[18] Allie Caren, *Anthony S. Fauci: "We Are Still in the First Wave" of Coronavirus*, Washington Post, https://www.washingtonpost.com/health/2020/06/18/anthony-fauci-interview-first-wave/?arc404=true (last visited Jun. 22, 2020)

[19] South Dakota Department of Health, *Novel Coronavirus (COVID-19) Updates and Information*, https://doh.sd.gov/news/coronavirus.aspx#SD (last visited June 21, 2020).

[20] *Id.*

[21] Griff White, *South Dakota's Governor Resisted Ordering People to Stay Home.  Now It Has One of the Nation's Largest Coronavirus Hot Spots*, Washington Post, https://www.washingtonpost.com/national/south-dakotas-governor-resisted-ordering-people-to-stay-home-now-it-has-one-of-the-nations-largest-coronavirus-hot-spots/2020/04/13/5cff90fe-7daf-11ea-a3ee-13e1ae0a3571_story.html (last visited Jun. 23, 2020).

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF – 1:20-cv-01709

35.     South Dakota has already been the site of a famous hotspot connected to a cluster of meat packing plants.[22]  Models used by health officials project a sustained outbreak in South Dakota.[23]

**III.     COVID-19'S Disproportionate Impact on Native Americans and Threat to the Tribe**

36.     The COVID-19 pandemic has had a particularly devastating effect on Native American communities.  Non-Hispanic American Indian or Alaska Native persons have a COVID-19 hospitalization rate approximately 5.5 times that of non-Hispanic White persons.[24]  By way of just a few examples, the Navajo Nation alone has reported 7,045 cases and 335 deaths related to COVID-19.[25]  The Pueblo of Zuni has reported 214 cases,[26] and the Cherokee Nation has reported 164 cases.[27]

37.     COVID-19 has put the Cheyenne River Sioux people in dire jeopardy.  Remoteness, millions of acres of land, and a historically failed trust mean a lack of adequate infrastructure.

38.     Disparities in access to transportation further exacerbate Native Americans' access to healthcare.  The Cheyenne River Sioux Tribal government has 1,700 miles of road to maintain, much of which is unpaved.  The Tribe receives federal funding to maintain only 300 miles of road.  During certain times of the year, wet conditions and melting snow make some roads nearly impassable.  Compounding that issue, several roads are still closed after the historic flooding in

[22] *Id.*

[23] *See* Institute for Health Metrics and Evaluation, *COVID-19 Projections, Social distancing assumed until infections minimized and containment implemented: South Dakota*, https://covid19.healthdata.org/united-states-of-america/south-dakota (last visited June 21, 2020).

[24] Ctrs. for Disease Control & Prevention, COVIDView https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/index.html (last visited June 23, 2020).

[25] Press Release, Office of the President and Vice President, The Navajo Nation, *3,716 New Recoveries, 55 New Cases and No More Deaths Related to COVID-19 Reported*, https://www.opvp.navajo-nsn.gov (June 22, 2020).

[26] Press Release, Pueblo of Zuni, Public Notice to the Zuni Community (June 15, 2020), http://www.ashiwi.org/COVID19/DailyPSAUpdate6-15-20.pdf.

[27] Official Website of the Cherokee Nation, https://www.cherokee.org/ (last visited June 23, 2020).

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF – 1:20-cv-01709

March 2019 destroyed entire swaths of the road all over the Reservation.  In many areas, there is no cell phone or internet service.  Residents of outlying communities must travel up to ninety miles to reach basic Indian Health Services ("IHS") medical care at the Tribal headquarters in Eagle Butte, South Dakota.

39.     Underlying health disparities further render Native Americans particularly vulnerable to COVID-19.  Native Americans suffer from disproportionately high rates of diabetes, cancer, heart disease, and asthma, which subject them to a greater risk of fatal complications from COVID-19.

40.     Racial discrimination has also resulted in socioeconomic inequalities that disadvantage Native Americans, like higher rates of unemployment, disability, and poverty.  These factors also make it more likely that Native Americans are forced to work outside of the home even during the current pandemic and are therefore more exposed to COVID-19.  The most recent census revealed that Ziebach County on the Cheyenne River Sioux Reservation is the poorest in the nation, where about sixty-two percent of residents live in poverty.  Inadequate housing on the reservation further complicates infection control: many homes contain 5-7 persons, lessening ability to quarantine and spreading infection more easily.

41.     The Tribe's IHS facility in Eagle Butte, South Dakota, has only eight in-patient beds, six ventilators, two negative pressure rooms, inadequate staff, and zero respiratory therapists to care for the Reservation's 10,000 resident Tribal members.  If more advanced medical intervention is needed for a COVID-19 patient, IHS has indicated that the patient will be transferred to an off-Reservation facility, the closest of which is 175 miles (three hours) away.

**IV.     The Cheyenne River Sioux's COVID-19 Response and Health Safety Checkpoints**

42.     On March 13, 2020, the Cheyenne River Sioux Tribal government declared a State of Emergency and took its first measures to combat COVID-19.  The Tribe's State of Emergency

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF – 1:20-cv-01709

Declaration activated the Tribe's Emergency Command Center and implemented other additional measures within the Tribe's sovereign and governmental authority, including: school and government office closures; a Reservation-wide travel ban for all government employees; and restrictions on Reservation-based organizations bringing non-resident individuals and organizations onto the Reservation.

43.     On April 1, 2020, the Cheyenne River Sioux Tribal government issued its first Emergency Executive Order related to the COVID-19 pandemic.  This Order implemented the first Health Safety Checkpoint plan consistent with the Tribe's jurisdiction over roads and lands within its territory.

44.     Under Emergency Executive Order # 02.1-2020-CR, every vehicle not simply passing through the Cheyenne River Sioux Reservation must complete a travel plan form that includes information such as the names and addresses of vehicle occupants, destination, purpose of travel, dates of travel, expected stops, whether any occupants have experienced any COVID-like symptoms or have been in a hotspot area, and other questions.  This information enables the Command Center and Tribal Community Health Department to be able to perform contact tracing and monitor individuals as necessary.

45.     The Cheyenne River Sioux Tribe's checkpoint, monitoring, and contact tracing system have been so successful that **the Tribe has had only six reported cases of COVID-19 on its Reservation, and each of those cases can be traced to entries identified through the Tribe's Health Safety Checkpoint informational system.**  To date, there has been no community spread of COVID-19 and no deaths.

46.     On April 8, 2020, the Cheyenne River Sioux Tribal government passed three additional Emergency Executive Orders.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF – 1:20-cv-01709

47.     Emergency Executive Order #02.2-2020-CR instituted mandatory 14-day quarantines for both member and nonmember residents who are infected, exposed, or are suspected to have been exposed.

48.     Emergency Executive Order #02.3-2020-CR issued a Stay-at-Home Recommendation. This Order further prohibited all gatherings of ten or more people outside of a single household, which applies to both members and nonmembers of the Tribe as a function of the Tribe's civil jurisdiction.   The Order likewise ordered closed all non-essential businesses, including "amusement rides, museums, arcades, vending machines, playgrounds, movie and other theaters, bars, country clubs or social clubs."  The Order also restricted travel within, into, and out of the Reservation to only essential activities.   Only essential government employees who are not vulnerable (high-risk) are still working.

49.     Emergency Executive Order #02.4-2-2020-CR permits the purchase of alcohol on the Reservation only from 11:00 a.m. until 3:00 p.m.

50.     On April 30th, 2020, the Cheyenne River Sioux Tribal government passed Emergency Executive Order #02.5-2-2020-CR.  This new Order included a mandatory stay-at-home order for all persons, including both members and nonmembers, currently residing (either temporarily or permanently) within the Reservation.  "Essential activities" include essential health and safety tasks; obtaining and delivering necessary services and supplies; outdoor activity; essential businesses and operations, including healthcare and public health operations, essential infrastructure such as road repair, essential governmental functions for Tribal, local, state, federal government personnel; caring for others; and other essential jobs such as farming, food retail, ranching, gas stations, etc.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF – 1:20-cv-01709

51.     The Tribe has civil regulatory authority to maintain Health Safety Checkpoints set up to avoid the devastating impacts that an outbreak of COVID-19 would have on the Tribe.  In *Montana v. United States*, the Supreme Court affirms that the Tribe has an inherent right to exercise civil jurisdiction over nonmembers with respect to "conduct [that] threatens or has some direct effect on the political integrity, the economic security, or the health and welfare of the Tribe."  450 U.S. 544, 566 (1981).  It is difficult to think of an instance in which the conduct of nonmembers entering the Reservation could pose more of a threat to the Tribe's health and welfare than it does during the present outbreak of COVID-19.  Moreover, in any test of balancing interests, the Tribe's checkpoints pose only a minor inconvenience to non-Indian motorists when compared to the seriousness of the threat of COVID-19 to the Reservation.

## V.     South Dakota's Unlawful Threats to the Tribe and Its Health Safety Checkpoints

52.     On April 23, 2020, South Dakota Governor Kristi Noem sent a letter to Defendant Secretary of Interior Bernhardt requesting assistance regarding the Tribe's Health Safety Checkpoints on South Dakota federal and state highways.

53.     On April 24, 2020, the Bureau of Indian Affairs, United States Department of Interior ("BIA") sent a letter to the Tribe reprimanding the Tribe for not consulting with the state on its Health Safety Checkpoints.

54.     On April 26, 2020, the Cheyenne River Sioux Tribe sent a letter to the BIA outlining its lawful actions in establishing its Health Safety Checkpoints.

55.     On May 8, 2020, Governor Noem directed a letter to the Cheyenne River Sioux Tribe threatening: "If the checkpoints are not removed within the next 48 hours, the state will take

necessary legal action."  Notably, Governor Noem failed to send the letter directly to the Tribe or any Tribal officer.  Instead, she released it only to the press and on the state website.[28]

56.     Later on May 8, 2020, Cheyenne River Sioux Chairman Harold Frazier responded to Governor Noem's threat, declining the Governor's request and stating: "**We will not apologize for being an island of safety in a sea of uncertainty and death**."

57.     The Governor's 48-hour deadline expired without any "legal action.".

58.     On May 12, 2020, Governor Noem sent another letter to Cheyenne River Sioux demanding the removal of the Health Safety Checkpoints.

59.     On May 13, 2020, Chairman Frazier sent a letter to Governor Noem explaining that the Cheyenne River Sioux Tribe would continue to operate its Health Safety Checkpoints and requested that any specific complaints that she had received about the same should be forwarded to the Tribe.

**VI.     Defendants' Unlawful Threats to the Tribe and Its Health Safety Checkpoints**

60.     On May 20, 2020, Governor Noem sent a letter to the Defendant President Donald J. Trump requesting that he use federal government authority to remove the Tribe's Health Safety Checkpoints.  A copy was not delivered to the Tribe, but again the Governor released the letter to the press and on the state website.[29]

61.     On information and belief, during the period between May 20, 2020 and June 7, 2020, BIA OJS engaged in an investigation of the Tribe's Health Safety Checkpoints that the BIA has since characterized as a "factfinding operation."

---

[28] Although the Governor's press release remains, the state has removed a copy of the letter itself from the state website.  *See Governor Noem to Tribes: Remove All Checkpoints*, May 8, 2020 https://news.sd.gov/newsitem.aspx?id=26770 (last visited Jun. 23, 2020).
[29] Letter from Gov. Kristi Noem to President Donald J. Trump, May 20, 2020, *available at* https://covid.sd.gov/docs/GovNoemlettertoWhiteHouse.pdf (last visited Jun. 23, 2020).

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF – 1:20-cv-01709

62.     On June 7, 2020, Defendant Assistant Secretary Sweeney; Defendant BIA Director LaCounte; Defendant Great Plains Regional Director LaPointe; Defendant Office of Justice Services (OJS) Director Addington; Jason O'Neal, OJS; and Kyle Scherer, Solicitor's Office, Department of Interior (DOI), phoned the Tribe and indicated for the first time that the BIA was contemplating emergency reassumption of the Tribe's P.L. 93-638 law enforcement contract[30] on the grounds that the Tribe's Health Safety Checkpoint monitors allegedly were not properly deputized and were not properly trained.  Defendants further indicated that they would require some sort of unspecified modification of the checkpoints in return for BIA support, including license plate readers, remote monitoring, and additional officers.

63.     In a June 8, 2020 letter to the Tribe, Defendant Assistant Secretary Sweeney stated that the Health Safety Checkpoints on US 212 and SD 63 were "prohibiting access" to the highways and that the deputization of checkpoint monitors was a breach of compliance of the Tribe's P.L. 93-638 law enforcement contract.  Defendant Assistant Secretary Sweeney provided that if the Tribe failed to correct these alleged "violations," the "BIA has determined that such actions would constitute an immediate threat of imminent harm to the safety of any person" and that the agency would initiate emergency reassumption.  In order to correct the alleged "violations," Defendant Assistant Secretary Sweeney informed the Tribe that it would "need to withdraw the deputations of those individuals who do not meet the standards required by federal regulation, as incorporated into the Tribe's law enforcement contract."

---

[30] A contract under P.L. 93-638 is a mechanism by which a tribe may contract with the United States to operate functions, like law enforcement, otherwise performed by the federal government as a function of the United States' trust duty to tribes.  Reassumption of a P.L. 93-638 contract is an extraordinary remedy that impairs the self-government and sovereignty of an Indian tribe.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF – 1:20-cv-01709

64.     On June 9, 2020, BIA sent staff from OJS District I to the Cheyenne River Sioux Tribe police headquarters to search for any deficiencies in the background investigation and basic training of the Tribe's Health Safety Checkpoint monitors in their effort to justify reassumption of the Tribe's P.L. 93-638 law enforcement contract.   When BIA staff arrived, Tribal personnel advised them that the Tribe's Health Safety Checkpoint monitors **are not employed under the Tribe's P.L. 93-638 program**.  BIA staff were therefore only permitted to review documentation for the Tribe's P.L. 93-638 law enforcement officers.

65.     On June 9, 2020, Cheyenne River Sioux Tribal Chairman Harold Frazier received a telephone call from Defendant Mark Meadows, White House Chief of Staff.  Meadows offered the Chairman a meeting with Defendant Dr. Birx to strategize a COVID-19 response plan that would contemplate dismantling the Tribe's Health Safety Checkpoints.  Defendant Meadows advised that he had just "left a meeting . . . where . . . this whole issue of checkpoints was brought up." Meadows expressed his "longstanding love for . . . Native American tribe[s]," Governor Noem's request to the White House for federal intervention, and Meadows' belief that he did not think that federal intervention "does the President any good . . . [and] does [not] do you any good."  Meadows requested that the Tribe "reconsider taking down the checkpoints" before the situation escalates:

> I got this put on my desk about an hour ago - - and they were about to get the Department of Interior to come in and - - and look at taking over policing on - - on Sioux lands, and I said, oh-h-h, before we - - get all crazy about it, I said let me call the Chairman and . . . ask him if . . . there is a way to find a way to take down these checkpoints without it getting all escalated.

64.     On his call with Defendant Meadows, Chairman Frazier explained that he understood the Tribe was still negotiating with the BIA concerning Health Safety Checkpoints and expected to receive a letter from Assistant Secretary Sweeney furthering that negotiation.  Defendant Meadows disagreed and explained that he did not believe that the BIA was still negotiating:

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF – 1:20-cv-01709

> Yeah, I think it was about to be escalated in a different manner is the problem.  I mean, it's just - - it's gotten to the point where - - yeah, I don't know that that was the letter you were going to get.  My understanding, you were going to get a 24-hour, 48-hour kind of, you better take it down or we're going to come in and take over law enforcement on tribal lands . . ..

65.    Defendant Meadows reiterated throughout the call that "I can't have checkpoints" on a federal road and advised Chairman Frazier that he would be receiving a call from Defendant Dr. Deborah Birx.

66.    Defendant Meadows concluded his call with Chairman Frazier by threatening the security of the Tribe's Coronavirus Relief Fund monies set aside by Congress in the Coronavirus Aid, Relief, and Economic Security (CARES) Act, 42 U.S.C. § 801, if the Tribe used the funds for its Health Safety Checkpoints.[31]  Defendant Meadows explained:

> I would have to look up exactly how much money we sent to you[,] but I can tell you that the eight billion is the largest amount of money ever sent to Native American tribes under any administration, Republican or Democrat, uh, and I'm proud of that but I also need you to use that money so that it doesn't create a problem for me on . . . other issues because we still have another 40 percent of the money to go out.  I know I approved five hundred million the other day to go to different, uh, you know, tribes for healthcare that you -- you would have already received some of the money there but you had already received, probably have received six – part of the 60 percent of the eight billion as well and there is another 40 percent that I – I have got to release so, uh, just so I'm -- **I'm hopeful that you have enough financial assets to deal with this** in a way that we can – we can work cooperatively and – and, you know, take this off of your to do and my to do if – if we can[,] but I'll have them reach to you tomorrow.

---

[31] The Tribe is aware there exists room for substantial discretion in the amount of Tribal Coronavirus Relief Funds distributed to each Tribe by the federal government, as evidenced by the flurry of litigation surrounding those distributions.  Furthermore, despite clear statutory mandates, disputes have also arisen regarding entities eligible for Tribal distributions and the timing of said distributions.  See generally *Confederated Tribes of the Chehalis Reservation v. Mnuchin*, No. 1:20-cv-1002- APM (D.D.C.); *Cheyenne River Sioux v. Mnuchin*, No. 1:20-cv-1059-APM (D.D.C.); *Ute Indian Tribe v. Mnuchin*, No. 1:20-cv-1070-APM (D.D.C.); *Agua Caliente Band v. Mnuchin*, No. 1:20- cv-1136-APM (D.D.C.); *Prairie Band of Potawatomi Nation v. Mnuchin*, 1:20-cv-1491-APM (D.D.C.); *Prairie Band of Potawatomi Nation v. Mnuchin*, No. 20-5171 (D.C. Cir.); *Shawnee Tribe v. Mnuchin*, 20-290-JED-FHM (N.D. Okla.).

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF – 1:20-cv-01709

66.     On June 10, 2020, Defendant Assistant Secretary Sweeney sent the letter that Defendant Meadows described to Chairman Frazier ("Compliance Letter") that provided that the Tribe was out of compliance with its Public Law 93-638 law enforcement contract for "numerous instances in which individuals placed at [Tribal] checkpoints along United States Route 212 (US 212) and South Dakota Highway 63 (SD 63) are presenting themselves as [Tribal] polices officers and prohibiting access to US 212 and SD 63."  Defendant Sweeney's Compliance Letter did not acknowledge the Tribe's representation to BIA on June 9, 2020 that Tribal Health Safety Checkpoint monitors are not P.L. 93-638 employees.  A copy of the Compliance Letter is attached hereto as Exhibit C.

67.     In her Compliance Letter, Defendant Assistant Secretary Sweeney demanded that the Tribe promptly take certain Immediate Compliance Actions, including, "disband[ing] the checkpoints inhibiting traffic along US 212 and SD 63 until such time as consultation with the State has occurred and a mutually agreeable solution is reached."  The Compliance Letter gave the Tribe until the end of the week, June 12, 2020, about 48 hours as Defendant Meadows had forecast, to complete the "Immediate Compliance Actions," "to ensure the Tribe can continue operating its law enforcement contract"  -- a threat of emergency reassumption of the Tribe's P.L. 93-638 law enforcement contract.

68.     After transmission of the BIA's June 10, 2020 Compliance Letter, the parties attended a telephone conference at which Chairman Frazier expressed confusion about the BIA's intent to execute emergency reassumption of the Tribe's P.L. 93-638 contract as **the Tribe's Health Safety Monitors are not P.L. 93-638 employees**.  BIA officials, however, still alleged monitors were holding themselves out as law enforcement officers.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF – 1:20-cv-01709

69.     On June 11, 2020, Chairman Frazier sent a letter to Defendant Assistant Secretary Sweeney in response to her Compliance Letter, clarifying again that Tribal Health Safety Checkpoint monitors are *not* deputized as police officers and are *not* paid using the Tribe's P.L. 93-638 contract funding.  Chairman Frazier provided in his letter that the Tribe would remove any patches and badges from the Health Safety Checkpoint monitors to ensure that there was no further confusion as to their status.  The Tribe did not agree, however, to dismantle the Health Safety Checkpoints or further consult with the state as demanded by BIA's Compliance Letter.

70.     On June 12, 2020, Defendant Special Agent in Charge McClure sent a follow-up letter to Chairman Frazier specifically threatening both monetary penalties and forcible dismantling of the Tribe's law enforcement program if the Tribe failed to comply with corrective action demanded by the government: Such failure "could result in suspension, withholding, or delay in payment of funds, pursuant to the authority contained in Title I, Section 106(1) [25 USC 5325 (1)], questioned and/or disallowed costs for the program, up to and including the process to begin reassumption of the P.L. 93-638 contract in accordance with 25 CFR § 900.248, or any additional action as deemed applicable by the Awarding Official."

71.     Defendant Assistant Secretary's 48-hour deadline expired with no action.

72.     In a June 13, 2020 letter, without withdrawing the government's existing threat to reassume the Tribe's P.L. 93-638 contract because of alleged irregularities with Checkpoint monitors, Defendant Assistant Secretary Sweeney pivoted to *also* threaten emergency reassumption of the Tribe's P.L. 93-638 law enforcement contract because of technical non-compliance in P.L. 93-638 officers' Human Resource files.

73.     On June 15, 2020, Chairman Frazier and other Tribal staff joined the call promised by Defendant Meadows with Defendant Dr. Deborah Birx and other White House staff, including

23

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF – 1:20-cv-01709

Defendant Deputy Assistant to the President Douglas Hoelscher; Defendant Assistant Secretary Sweeney; Admiral Michael Weahkee, Director of Indian Health Service; Peggy Honein, Centers for Disease Control; Tyler Fish, White House Senior Policy Advisor and Tribal Liaison; and Mark Anderson, Emergency Response and Recovery Branch's Deputy Chief.

74.     On that call, Defendant Dr. Birx provided the Tribe with her opinion that the COVID-19 infection rate has already peaked: "South Dakota's peak was way back in the beginning of April when South Dakota had about 150 cases a day.  For the last month it's been under, running around 40 to 50 cases a day so you have moved past peak and you're into stable.

75.     On that call, Defendant Dr. Birx also provided her opinion that the Cheyenne River Sioux Tribe should remove its Public Health Checkpoints, noting that because of the existence of asymptomatic cases, "I think that's when changing the strategy from checkpoint driven to really proactive surveillance and testing within the tribe and testing people who come into the tribe will be really critical."

76.     The Cheyenne River Sioux Tribe's COVID 19 Response Plan relies on flagging exposed individuals upon arrival at the Reservation.  In essence, Dr. Birx suggested dismantling that strategy in favor of testing that would thereafter be blind to risk factors:

> Yeah, Chairman, I just want to say, when people are in their cars on a road as you described, they are not transmitting the virus so I think what we need to do is figure out a way to -- if they people actually come onto the reservation, not in their cars but actually physically out of their cars, and then what we're going to do to help you with testing.

77.     On the call, Defendant Dr. Birx did not reference any of the following: Tribally focused demographic data, the Tribe's comprehensive COVID-19 prevention plan, the low rate of infection on the Cheyenne River Sioux Reservation, the heightened risk of infection among the Tribal

population, the inadequacy of health care on the Cheyenne River Sioux Reservation, or the profound success of the plan already in place.

78.     On June 17, 2020, Defendant Deputy Assistant to the President Hoelscher; Defendant Assistant Secretary Sweeney; Defendant BIA Director LaCounte; Defendant Deputy Bureau Director James; Defendant Great Plains Regional Director LaPointe; Defendant OJS Deputy Director Addington; Jason O'Neal, OJS; and Kyle Scherer, Interior Solicitor's Office initiated a phone call with Chairman Frazier.  In this call, Defendant Assistant Secretary Sweeney reiterated at length the government's objection to the Tribe's Health Safety Checkpoints and reiterated at length the government's desire that the Checkpoints be taken down in exchange for various technological supports.  The Tribe declined the BIA's "package deal" as ill-suited to its existing tracing program.  The government immediately pivoted to discussion of technical non-compliance contained in Tribal P.L. 93-638 officers' Human Resource files:

> Well, Mr. Chairman, it seems like you, uh, you're uh, declining the offer for the enhanced technology and enhanced support from the federal government on the check points.  Maybe we could, uh, just pivot the conversation to, uh, your tribe has gotten way out of compliance on, uh, the law enforcement, um, not having the right records on hand."

79.     The June 17, 2020 call ended with Defendant Assistant Secretary Sweeney's praise of the Tribe's efforts to bring itself into full compliance with its P.L. 93-638 contract.  Defendant Assistant Secretary Sweeney advised Chairman Frazier of an ongoing plan to further facilitate Tribal compliance with the P.L. 93-638 contract and advised the Chairman that this would close the matter:

> I have instructed B.I.A., O.J.S. to provide me with a compliance project plan and weekly report so that my office can track the progress towards full compliance, and, uh, as we continue along this path working cooperatively towards compliance so that the tribe can retain its 638 contract and address the, uh, issues that have been

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF – 1:20-cv-01709

raised.  So I welcome your concurrence to close this matter until such time that warrants further discussion."

80.     The Tribe was, therefore, very surprised on June 22, 2020, when it received Defendant Deputy Director OJS Addington's letter to Chairman Harold Frazier demanding that the Tribe pull from service any member of the Cheyenne River Sioux Tribal police department if said member does not have "a completed and adjudicated background check on file equivalent to a federal officer performing law enforcement duties" and directly threatening immediate emergency reassumption if the Tribe did not do so with twenty-four hours.

## VII.    Defendant Assistant Secretary's Violations of ISDEAA and the Cheyenne River Sioux Tribe's P.L. 93-638 Contract

81.     Congress enacted the Indian Self-Determination and Education Assistance Act, Public Law 93-638 ("ISDEAA"), in 1975 with a purpose to empower Indian tribes to be both self-determining and self-governing by enabling tribes to enter into contracts to take over administration of programs formerly administered by the federal government as a function of its trust responsibility. 25 U.S.C. § 5302.

82.     The Cheyenne River Sioux Tribe currently operates under a P.L. 93-638 contract for law enforcement services, among other functions, and said contract includes all contract terms required by law and discussed below.  *Department of the Interior, Bureau of Indian Affairs, Great Plains Regional Office, Cheyenne River Agency, Public Law 93-638, as amended, Section 108 Model Contract with Cheyenne River Sioux Tribe,* A20AV00277 "Contract A20AV00277").

83.     ISDEAA provides that "[e]xcept as specifically provided in the Indian Self-Determination and Education Assistance Act the Contractor is not required to abide by program guidelines, manuals, or policy directives of the Secretary, unless otherwise agreed to by the Contractor and

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF – 1:20-cv-01709

the Secretary, or otherwise required by law."   25 U.S.C § 5329(c)(b)(11) (internal citations omitted); 25 C.F.R. § 900.4; Contract A20AV00277 at (b)(11).

84.     Defendant Assistant Secretary Sweeney violated ISDEAA and the Tribe's P.L. 93-638 law enforcement contract by unlawfully attempting to require the Cheyenne River Sioux Tribe to abide by her policy directives with respect to the Tribe's Health Safety Checkpoints, which were unrelated to the P.L. 93-638 contract and which the Tribe operates as a function of its inherent sovereign authority and responsibility to protect its people as recognized under *Montana v. United States*, 450 U.S. 544 (1981).

85.     ISDEAA provides that each P.L. 93-638 contract must provide a reaffirmation of the trust responsibility of the United States to the Tribe.   25 U.S.C.A. § 5329(c)(d)(1)(a); Contract A20AV00277 at (d)(1)(a).  The Tribe's contract accordingly provides:

> **(d) OBLIGATION OF THE UNITED STATES**
>
> > **(1) TRUST RESPONSIBILITY**
> >
> > > **(A) IN GENERAL.**  The United States reaffirms the trust responsibility of the United States to the **Cheyenne River Sioux Tribe** to protect and conserve the trust resources of the Indian tribe(s) [sic] and the trust resources of individual Indians.
> > > **(B) CONSTRUCTION OF CONTRACT.**  Nothing in this Contract may be construed to terminate, waive, modify, or reduce the trust responsibility of the United States to the tribe(s) [sic] of individual Indians.  The Secretary shall act in good faith in upholding such trust responsibility.

86.     Defendant Assistant Secretary Sweeney has violated the ISDEAA and the Tribe's P.L. 93-638 law enforcement contract by breaching her express trust responsibility to the Tribe.

87.     ISDEAA further provides that each P.L. 93- 638 contract shall provide that the Secretary must act in good faith in cooperating with the Tribe in furtherance of the 638 contract.  25 U.S.C.A. § 5329(c)(d)(2); Contract A20AV00277 at (d)(2).  The Tribe's contract accordingly provides:

**GOOD FAITH**.  To the extent of available funds, the Secretary shall act in good faith in cooperating with the Contractor to achieve the goals set forth in this contract.

88.     Defendant Assistant Secretary Sweeney has violated the ISDEAA and the Tribe's P.L. 93-638 law enforcement contract by breaching her duty to act in good faith in her administration of the Tribe's P.L. 93-638 contract.

89.     ISDEAA limits circumstances in which the Secretary may interfere with an ongoing P.L. 93-638 contract: Only if the Secretary determines that a Tribe's performance under a contract involves "(1) the violation of the rights or endangerment of the health, safety, or welfare of any persons; or (2) gross negligence or mismanagement in the handling or use of funds," may the Secretary "after providing notice and a hearing on the record to such tribal organization, rescind such contract or grant agreement, in whole or in part, and assume or resume control or operation of the program, activity, or service involved if he determines that the tribal organization has not taken corrective action as prescribed by the Secretary to remedy the contract deficiency."  25 U.S.C. § 5330.  The Act further limits the Secretary's ability to assume a Tribe's P.L. 93-638 contract on an emergency basis only upon a finding that "(i) there is an immediate threat of imminent harm to the safety of any person, or imminent substantial and irreparable harm to trust funds, trust lands, or interests in such lands, and (ii) such threat arises from the failure of the contractor to fulfill the requirements of the contract."  25 U.S.C. § 5330.

90.     Defendant Assistant Secretary Sweeney fails to allege any "immediate threat of imminent harm to the safety of any person."  Unrelated Tribal governmental functions in the Tribe's operation of Health Safety Checkpoints are irrelevant to P.L. 93-638 compliance.  The cited technical human resources irregularities of the Tribe's police department do not meet the standards for either emergency or non-emergency reassumption set forth in 25 U.S.C. § 5330.

91.     Even if the deficiencies cited by Defendant Assistant Secretary Sweeney were material to the integrity of the P.L. 93-638 contract, Defendant Assistant Secretary Sweeney reiterated, as recently as June 17, 2020, her acknowledgement that the Tribe has taken appropriate corrective action as prescribed and she has stated her intent to continue ongoing efforts with the Tribe to resolve any remaining issues.

92.     Defendant Assistant Secretary Sweeney has no lawful power to interfere with the internal governance of a Tribe and then pivot unilaterally to sever a contractual relationship as a punitive action for the Tribe's refusal to relinquish its sovereignty. .

93.     Defendant Assistant Secretary Sweeney has used the Tribe's PL 93-638 law enforcement contract as leverage against the Tribe in an effort to force the Tribe to shut down its Health Safety Checkpoints, as demanded by the state of South Dakota and the White House.  Such *ultra vires* action abused of her authority as Assistant Secretary and violated the terms of Tribe's P.L. 93-638 contract and of the ISDEAA.

**VII.     Department of Interior's Duty to Perform Background Checks for Tribal Officers**

94.     The Tribal Law and Order Act (TLOA), Public Law 111-211 (2010), established requirements for the Office of Justice Services to develop standards and deadlines for background checks and to complete these checks for tribal justice officials when an Indian tribe, under the Indian Self-Determination and Education Assistance Act, requests assistance:

> (4) BACKGROUND CHECKS FOR TRIBAL JUSTICE OFFICIALS.—
>
> (A) IN GENERAL.—The Office of Justice Services shall develop standards and deadlines for the provision of background checks to tribal law enforcement and corrections officials.
>
> (B) TIMING.—If a request for a background check is made by an Indian tribe that has contracted or entered into a compact for law enforcement or corrections services with the Bureau of Indian Affairs pursuant to the Indian Self-Determination and

Education Assistance Act (25 U.S.C. 450 et seq.), the Office of Justice Services shall complete the check not later than 60 days after the date of receipt of the request, unless an adequate reason for failure to respond by that date is provided to the Indian tribe in writing.

Section 231(a)(4); 25 U.S.C. § 2802(e)(4).

95.     The Tribal Law and Order Act creates an affirmative duty by the Department of Interior to conduct and adjudicate background checks for the Tribe.

96.      The Department of Interior, through the Interior Defendants, failed to recognize several years of correspondence as the Tribe's adequate request for assistance in its background checks, despite the Tribe's clear statement that financial burden of the adjudications was the major impediment to completing them.

97.     The Department of Interior now inappropriately seeks to exploit technical flaws in the Tribe's background checks as a pretext to initiate  reassumption of the Tribe's Public Law 93-638 law enforcement contract.

## VIII.   Defendants' Breach of Trust Violations

98.     The Supreme Court of the United States has recognized "the undisputed existence of a general trust relationship between the United States and the Indian people." *United States v. Mitchell*, 463 U.S. 206, 225 (1983); *United States v. Navajo Nation*, 537 U.S. 488, 506 (2003); *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 176 (2011); *see also United States v. Kagama*, 118 U.S. 375, 383-84.[32]

---

[32] The United States owes a special duty to the tribes in their dealings with the states:

These Indian tribes ***are*** wards of the nation.  They are communities ***dependent*** on the United States,-dependent largely for their daily food; dependent for their political rights.  They owe no allegiance to the states, and receive from them no protection.  Because of the local ill feeling, the people of the states where they are found  are  often  their  deadliest  enemies.    From  their  very  weakness  and helplessness, so largely due to the course of dealing with the federal government with them, and the treaties in which it has been promised there arises the duty of

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF – 1:20-cv-01709

99.     A tribe properly may bring a breach of trust claim against the federal government when it "identif[ies] a substantive source of law that establishes specific fiduciary duties, and allege[s] that the Government has failed faithfully to perform those duties."  *Navajo Nation*, 537 U.S. at 506.

100.    The 1868 Treaty of Fort Laramie, the Snyder Act of 1921, the ISDEAA, the Indian Law Enforcement Reform Act (ILERA), P.L. 101-379, 104 Stat 473 (1990), and the Tribal Law and Order Act, Pub. L. No. 111-211, 124 Stat. 2258 (2010) are substantive sources of law that impose a duty on the United States to provide the Cheyenne River Sioux Tribe with public safety services.

101.    In exchange for mutual peace and vast forfeiture of land by the Sioux Nation, the 1868 Treaty of Fort Laramie provides that:

> **If bad men among the whites, or among other people subject to the authority of the United States, shall commit any wrong upon the person or property of the Indians, the United States will, upon proof made to the agent, and forwarded to the Commissioner of Indian Affairs at Washington city, proceed at once to cause the offender to be arrested and punished according to the laws of the United States and to reimburse the injured person for the loss sustained.**
>
> ***
>
> The United States agrees that the agent for said Indians shall in the future make his home at the agency building; that he shall reside among them, and keep an office open at all times for the purpose of prompt and diligent inquiry into such matters of complaint by and against the Indians as may be presented for investigation under the provisions of their treaty stipulations, as also for the faithful discharge of other duties enjoined on him by law. **In all cases of depredation on person or property he shall cause the evidence to be taken in writing and forwarded, together with his findings, to the Commissioner of Indian Affairs, whose decision, subject to the revision of the Secretary of the Interior, shall be binding on the parties to this treaty**.

1868 Treaty of Fort Laramie, Arts. I and V.  The U.S. Supreme Court has affirmed that the language of this specific treaty creates an express trust duty: "The corresponding obligation of

---

protection, and with it the power.  This has always been recognized by the executive, and by congress, and by this court, whenever the question has arisen.

*Kagama*, 118 U.S. at 383-84.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF – 1:20-cv-01709

protection on the part of the government is immediately connected with [the treaty language], in the declaration that each individual shall be protected in his rights of property, person, and life, and that obligation was to be fulfilled by the enforcement of the laws then existing to those objects, and by the future appropriate legislation which was promised to secure to them an orderly government." *Ex parte Kan-gi-shun-ca*, 109 U.S. 556, 569 (1883) (interpreting the 1868 Treaty of Fort Laramie in the context of the federal law enforcement obligation).

102.    The Snyder Act of 1921 instructs federal agencies to "direct, supervise, and expend such moneys as Congress may from time to time appropriate for . . . the employment of inspectors, supervisors, superintendents, clerks, field matrons, farmers, physicians, **Indian police**, Indian judges, and other employees."  25 U.S.C. § 13.

103.    ILERA provides that "[t]he Secretary, acting through the Bureau, shall be responsible for providing, or for assisting in the **provision of, law enforcement services in Indian country** as provided in this Act."  25 U.S.C. 2802(a).  ILERA further provides that the responsibilities of the Office of Justice Services in Indian country include, among other duties:

> (1) the enforcement of Federal law and, with the consent of the Indian tribe, tribal law
>
> ***
>
> (12) conducting meaningful and timely consultation with tribal leaders and tribal justice officials in the development of regulatory policies and other actions that affect public safety and justice in Indian country.

25 U.S.C. § 2802(c).

104.    The Tribal Law and Order Act, passed in 2010, explicitly lays out the federal government's trust duty to the Tribe with respect to public safety in Indian Country.  The Act provides that "**the United States has distinct legal, treaty, and trust obligations to provide for the public safety of Indian country**."  Pub. L 111-211, 124 Stat. 2262.  Within the Act, Congress further

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF – 1:20-cv-01709

acknowledges that "tribal justice systems are often the most appropriate institutions for maintaining law and order in Indian country."  25 U.S.C. § 2801(a)(2)(B).

105.    The ISDEAA exists to exercise the United States' trust duty in the context of self-determination, hence the duty is expressly referenced and assumed throughout.  *E.g.*, 25 U.S.C. § 5301(a) (placing ISDEAA within the context of "**the Federal Government's historical and special legal relationship with, and resulting responsibilities to, American Indian people**"); 25 U.S.C. § 5321(g) ("[T]he Secretary shall not make any contract which would impair his ability to discharge his **trust responsibilities** to any Indian tribe or individuals."); 25 U.S.C. § 5329(g) (providing model contract language concerning the "Obligation of the United States" and its "Trust responsibility"); 25 U.S.C. § 5332(2) ("**Nothing in this chapter shall be construed as . . . authorizing or requiring the termination of any existing trust responsibility of the United States with respect to the Indian people**.").  The ISDEAA further explicitly requires that all contracts under the Act contain language that provides the "United States **reaffirms the trust responsibility of the United States to the . . . Indian tribe(s)** to protect and conserve the trust resources of the Indian tribe(s) and the trust resources of individual Indians."  25 U.S.C. § 5329(c)(d)(1)(A).

106.    In addition to having no reasonable basis in law, ALL Defendants' efforts to limit the Tribe's civil regulatory jurisdiction by threatening to reassume and terminate its Public Law 93-638 law enforcement contract is a serious breach of their trust duty with respect to the Cheyenne River Sioux Tribe.

107.    Defendants have no lawful power to interfere with the internal governance of a Tribe and to threaten to sever a contractual relationship if they disapprove of the manner in which the Tribe

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF – 1:20-cv-01709

chooses to carry out unrelated Tribal government programs. Such actions constitute a severe breach of trust.

108.    Defendants have used the Tribe's P.L. 93-638 law enforcement contract as leverage against the Tribe in an effort to force the Tribe to shut down its Health Safety Checkpoints as demanded by the state of South Dakota and the White House. Such *ultra vires* action abused the apparent authority of ALL Defendants and violated the United States' trust duty to the Cheyenne River Sioux Tribe.

109.

## **COUNT I**

### **(Violation of Contract: Injunctive Relief under 25 U.S.C. § 5331)**

110.    Plaintiff restates, realleges, and incorporates by reference all preceding paragraphs and allegations.

111.    Under 25 U.S.C. § 5331, this Court has original jurisdiction over any civil action or claim against the appropriate Secretary arising under the ISDEAA.

112.    Under 25 U.S.C. § 5331, this Court may order appropriate relief including money damages, injunctive relief against any action by an officer of the United States or any agency thereof contrary to the ISDEAA, or mandamus to compel a federal officer or employee to perform a duty imposed by the ISDEAA or its applicable regulations.

113.    Defendant Assistant Secretary Sweeney has violated Section (b)(11) of the Tribe's P.L. 93-638 contract by requiring the Tribe to comply with policy directives of the Assistant Secretary in matters unrelated to its administration of the Tribe's contract.

114.    Defendant Assistant Secretary Sweeney has violated Section (d)(1)(A), (B) of the Tribe's P.L. 93-638 contract by breaching her trust duty to the Cheyenne River Sioux Tribe.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF – 1:20-cv-01709

115.    Defendant Assistant Secretary Sweeney has violated Section (d)(2) of the Tribe's P.L. 93-638 contract by failing to cooperate in good faith with the Cheyenne River Sioux Tribe in administration of the Tribe's P.L. 93-638 contract.

116.    Defendant Assistant Secretary Sweeney's Compliance Letter and the subsequent enforcement efforts and actions of Defendants to reassume the Tribe's P.L. 93-638 contract violate 25 U.S.C. §5330.

117.    Plaintiff is entitled to an injunction preventing the Assistant Secretary from implementing her Compliance Order demanding that Health Safety Checkpoints must be shut down and enjoining reassumption of the Tribe's P.L. 93-638 contract.

## COUNT II

### (Violation of ISDEAA and Federal Common Law: Declaratory and Injunctive Relief under 5 U.S.C. § 706 and 28 U.S.C. §§ 2201-2202)

118.    Plaintiff restates, realleges, and incorporates by reference all preceding paragraphs and allegations.

119.    The APA authorizes judicial review of federal agency actions.  5 U.S.C. § 702.

120.    The APA provides that the reviewing Court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).  It further provides that a reviewing Court shall hold unlawful and set aside agency action, findings, and conclusions found to be in excess of statutory jurisdiction, authority, or limitations, or short of a statutory right.  5 U.S.C. § 706(2)(C).

121.    Assistant Secretary Sweeney has violated the ISDEAA by issuing a decision that the Department of Interior would unilaterally sever the contractual relationship if the Tribe continues to act in a manner of which she disapproves.

122.    Plaintiff is entitled to declaratory relief that Defendant Assistant Secretary's decision is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

123.    Plaintiff is entitled to an injunction preventing the Assistant Secretary from enforcing her decision.

## COUNT III

**(Violation of Treaty, Statutory, and Common Law Trust Duty:
Declaratory and Injunctive Relief under 5 U.S.C. § 706 and 28 U.S.C. §§ 2201-2202)**

124.    Plaintiff restates, realleges, and incorporates by reference all preceding paragraphs and allegations.

125.    The federal government has a specific, special trust duty pursuant to the ISDEAA and other federal statutes, the 1868 Treaty of Fort Laramie, and federal common law.  *See* 25 U.S.C. §§ 5329(a)(1) and 5329 (requiring that the Secretary shall include or incorporate by reference acknowledgment of the federal government's continuing trust responsibility into all 93-638 contracts.); 25 C.F.R. § 900.4 (requiring that the "Secretary shall act in good faith in upholding this trust responsibility.); *e.g.*, *United States v. Mitchell,* 463 U.S. 206 (1983).

126.    Having contracted with the Tribe under the ISDEAA, the Department of Interior and ALL Defendants have a statutory and fiduciary trust obligation in all actions taken in management of the Cheyenne River Sioux Tribe's P.L. 93-638 contract.

127.    ALL Defendants have violated their trust duty to the Tribe under the 1868 Treaty of Fort Laramie, the Snyder Act of 1921, the ISDEAA, ILERA, and the Tribal Law and Order Act to provide the Cheyenne River Sioux Tribe with public safety services. ALL Defendants have breached and continue to breach the trust duty of the United States to the Tribe and its members by threatening to shut down the Tribe's Health Safety Checkpoints through an unlawful invasion of tribal lands, by threatening to unlawfully assume law enforcement services over the Tribe, by

threatening to limit the Tribe's P.L. 93-638 funding, and by threatening to limit the Tribe's CARES Act funding, in its ongoing efforts to encroach upon the Tribe's jurisdiction.

128.   Plaintiff     is     entitled     to     a     declaratory     judgment     that     has ALL Defendants have violated their trust duty to the Tribe.

129.   Plaintiff is entitled to an injunction preventing the enforcement of Defendant Assistant Secretary Sweeney's Compliance Order.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

130.   Enter a declaratory judgment pursuant to 28 U.S.C. § 2201 in favor of Plaintiff that the Defendant Assistant Secretary's Compliance Order demanding that the Tribe's Health Safety Checkpoints were unlawful and must be shut down as arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law.

131.   Enter a declaratory judgment pursuant to 28 U.S.C. § 2201 in favor of Plaintiff that the Defendants' concerted efforts to shut down the Tribe's Health Safety Checkpoints breached the federal government's trust duty to the Cheyenne River Sioux Tribe and its members.

132.   Enjoin ALL Defendants from taking any further actions to enforce the Defendant Assistant Secretary's Compliance Order and determination that the Plaintiff's Health Safety Checkpoints were unlawful and must be shut down, including, but not limited to, authorizing federal officials to shut down the Plaintiff's Health Safety Checkpoints, reassuming jurisdiction of the Plaintiff Tribe's Public Law 93-638 law enforcement program, or threatening the Plaintiff Tribe's COVID-19 funding under the CARES Act, 42 U.S.C. § 801.

133.   Award Plaintiff its reasonable attorney's fees, costs, and such other relief as the Court deems just and appropriate.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF – 1:20-cv-01709

134.    Grant other such relief as the Court deems just and proper.

Dated:  June 23, 2020

Respectfully submitted,

/s/ Nicole E. Ducheneaux
 /s/ Rose M. Weckenmann
 Nicole E. Ducheneaux (DC Bar No. NE001)
 Rose M. Weckenmann (*pro hac* pending)
 Big Fire Law and Policy Group LLP
 1404 South Fort Crook Road
 Bellevue, NE 68005
 Telephone: (531) 466-8725
 Facsimile: (531) 466-8792
 Email: nducheneaux@bigfirelaw.com
 Email: rweckenmann@bigfirelaw.com

/s/ Judith A. Shapiro
 Judith A. Shapiro (DC Bar No. 376153)
 7059 Blair Road, N.W., Suite 202
 Washington, D.C. 20012
 Telephone: (202) 257-6436
 Email: jshapiro@bigfirelaw.com

*Attorneys for Plaintiff Cheyenne River Sioux Tribe*

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF – 1:20-cv-01709